# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| IN RE: HIGHER ONE ONEACCOUNT MARKETING AND SALES PRACTICES LITIGATION | No. 3:12-md-2407 (VLB) |

THIS DOCUMENT RELATES TO:

*Price, et al. v. Higher One Holdings, Inc., et al.*
D. Conn. Case No. 3:12-cv-01093-VLB

*Parker, et al. v. Higher One Holdings, Inc., et al.*
N.D. Miss. Case No. 1:12-cv-00154-NBB-DAS
D. Conn. Case No. 3:12-cv-01788-VLB

*Kent, et al. v. Higher One Holdings, Inc., et al.*
M.D. Ala. Case No. 2:12-cv-00712-NHT-TPM
D. Conn. Case No. 3:13-cv-00048-VLB

*Massey, et al. v. Higher One Holdings, Inc., et al.*
S.D. Ill. Case No. 3:12-cv-01149-MJR-SCW
D. Conn. Case No. 3:12-cv-01808-VLB

*Lanham, et al. v. Higher One Holdings, Inc., et al.*
W.D. Ky. Case No. 3:12-cv-00693-S
D. Conn. Case No. 3:12-cv-01811-VLB

May 13, 2013

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

## <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ................................................................................. 1

II.  STATEMENT OF FACTS................................................................... 5

   A.  Defendants defaulted Plaintiffs into Higher One accounts. ................................ 5

   B.  Higher One sent Plaintiffs deceptively "co-branded" debit cards. ...................... 5

   C.  Higher One deceptively discouraged Plaintiffs from opting-out of their Higher One accounts by threatening delayed access to financial aid money.................. 6

   D.  Defendants purposely made it difficult for Plaintiffs to opt-out of the Higher One account by foreclosing other banking options. ................................. 6

   E.  Higher One provided deceptive account disclosures to Plaintiffs and concealed the unconscionable and unusual fees associated with the accounts. ................. 7

   F.  Higher One breached the contract when it charged two ATM fees for each non-Higher One ATM withdrawal. ............................................................... 8

   G.  By providing an extremely limited number of "in-network" ATMs, which themselves provide only limited hours and days of operation, Higher One made it impossible for Plaintiffs to avoid non-Higher One ATM Fees. ................. 8

   H.  By labeling its access device a "debit card," Higher One deceived Plaintiffs into incurring "PIN-Based transaction fees". ......................................... 9

   I.  Defendants unlawfully charged overdraft fees on accounts used for financial aid funds and violated the covenant of good faith and fair dealing. ................................................................................................. 10

   J.  Higher One's practices and fees are outliers in the industry. ............................ 10

   K.  Defendants violate federal public policy promulgated in the Higher Education Act, DOE regulations, EFTA and Regulation E. ..................................... 11

III.  ARGUMENT....................................................................................... 11

   A.  Legal Standard. ................................................................................ 11

   B.  The Higher Education Act does not expressly preempt any of Plaintiffs' claims. ................................................................................................. 12

1.   §1098g does not preempt this lawsuit because Plaintiffs' claims are not based on disclosures relating to the terms of any student loans. ........... 12

2.   HEA regulations do not address the content of the Higher One disclosures.................................................................................... 18

C.   The HEA does not "impliedly preempt" any of Plaintiffs' state law claims because there is no "method-of-enforcement" conflict here.............................. 21

D.   Plaintiffs have met Rule 8(a) pleading standards with respect to all claims.......................................................................................... 26

E.   Defendants improperly ask this Court to selectively dismiss certain allegations. ................................................................................................ 31

1.   Plaintiffs plausibly allege that "cobranding" and "partner" representations were deceptive.................................................................... 32

2.   Plaintiffs plausibly allege that Defendants charged fees to access financial aid funds in violation of federal regulation. ....................................... 33

3.   Plaintiffs plausibly allege that placing the word "DEBIT" on students' cards, and failing to disclose a fee for using the card as a debit card, was deceptive. ................................................................... 34

4.   Plaintiffs' E-Sign Act allegation is well-plead, not as an independent basis for relief under CUTPA, but as a supporting fact for other violations. ........... 35

F.   Plaintiffs may maintain a claim for unjust enrichment. ........................................ 35

G.   Plaintiffs adequately plead a claim for rescission. ................................................ 38

H.   Defendants breached the contract. .................................................................... 39

I.   Plaintiffs' allegations support a claim for breach of the covenant of good faith and fair dealing................................................................ 41

J.   Plaintiffs have adequately pleaded a claim for conversion. ................................ 43

K.   Plaintiffs adequately allege a claim for statutory theft. ....................................... 45

IV.   CONCLUSION ........................................................................................ 46

## I.      INTRODUCTION

Plaintiffs are students from colleges across the country who allege that Defendant Higher One Holdings, Inc. ("Higher One") and its banking-partner co-defendants The Bancorp Bank and Wright Express Financial Services Corporation (collectively "Defendants") have devised a scheme to keep them and thousands of other students captive to Higher One for access to their own financial aid funds.  After steering Plaintiffs into Higher One bank accounts, Defendants charged them undisclosed, deceptive and unconscionable fees.

As Plaintiffs allege in detail in the Consolidated Amended Complaint ("CAC"), Defendants sent "debit cards" co-branded with the students' university logos to Plaintiffs.  The accounts associated with these debit cards were the default option for financial aid disbursement for entire campuses.  The only way for Plaintiffs to immediately access and obtain their financial aid refunds was to go to the Higher One website and activate these debit cards.  When the Plaintiffs activated their accounts, they were not provided disclosures of certain fees. Instead, the fee information was "submerged" in a separate document that no reasonable internet user would have viewed.

Then, the fees started.  Every time students used their so-called debit card to make PIN-based transactions, Defendants charged them a $.50 fee.  Indeed, the only way to avoid the fee was for students not to use their debit cards as debit cards, but to use them as a credit card, and sign for the transaction.  Defendants also charged Plaintiffs *two* ATM fees for every single ATM transaction not made at one of the needle-in-a-haystack Higher One ATMs—meaning a fee of $4.50 or

more for a student to access his or her own financial aid money.  Neither fee was disclosed anywhere in the Terms and Conditions and Related Disclosures ("T&C"), and both are highly unusual fee in the banking industry.  Some Plaintiffs incurred overdraft fees for using—or attempting to use—more financial aid money than they had.

Though this is Defendants' second motion to dismiss (the first having been denied as moot in light of Defendants' current Motion to Dismiss ("Motion")), Defendants for the first time argue that Plaintiffs' state law claims are expressly preempted by the Higher Education Act ("HEA").  This is an extraordinary overreach.  The express HEA preemption provision Defendants invoke only preempts state law claims that would impose disclosure requirements on students' loans.  While this Court has held a state law claim "rooted in a failure to disclose information required by the HEA would likely fall within" the terms of this express preemption provision, *Linsley v. FMS Inv. Corp.,* 3:11CV961 VLB, 2012 WL 1309840, at *4 (D. Conn. Apr. 17, 2012), that is not the case here. Defendants here did not make any of the HEA–required disclosures relating to student loans (because they do not make student loans).  Plaintiffs' inadequate disclosure allegations only concern bank account terms—not the terms of the loan, the requirements for loan consolidation, or any other disclosures mandated or governed by HEA.  If Higher One's breathtakingly broad HEA preemption argument were countenanced, any bank in the country that had a student's loan proceeds on deposit could use HEA preemption as a defense to any claims regarding that account.

2

Nor is conflict preemption applicable.  As numerous courts have held, the purpose of the HEA is to create a uniform market for student loans, and to ultimately encourage lenders to make such loans.  Plaintiffs' claims do not conflict in any way with this goal.  Nor do their claims in any way interfere with the regulatory system established to implement this goal.

Defendants also argue that some of Plaintiffs' allegations are "conclusory" and do not contain enough facts.  To the contrary, the CAC is extremely detailed; it describes the uniform misconduct to which each Plaintiff was subjected, it contains individualized attestations of causation, and it describes the individual harm each Plaintiff suffered.  There is no serious dispute that Defendants have been put on notice of the claims against them, and that Plaintiffs have "plead[ed] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009) (citation omitted).

Defendants also argue that "certain of the allegations supporting Plaintiffs' CUTPA and other state consumer protection claims" are not "plausible."  First, it is well-settled that a court cannot be asked to analyze and decide whether individual factual allegations are "implausible."  *Braden v. Wal-Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir. 2009) (citing *Vila v. Inter-Am. Inv., Corp.,* 570 F.3d 274, 285 (D.C. Cir. 2009)).  The issue before the Court is whether the *claims* made are plausible or not.  Even if this Court were to engage in the wild goose chase that Defendants request, however, none of the four allegations identified by Defendants are implausible.

Defendants ask the Court to dismiss the unjust enrichment claim because Plaintiffs also allege a breach of contract claim.  But Plaintiffs' primary theory in this case is that there was no contract with respect to certain fees—because they were submerged in a hidden Fee Schedules that never became part of a "meeting of the minds" needed to form a valid contract.  If they fail on this unjust enrichment theory (after discovery), they are entitled to proceed with their alternative contract claim.

Defendants also ask this Court to dismiss Plaintiffs' express breach of contract and breach of the implied covenant of good faith and fair dealing claims. Defendants' argument for dismissal of the contract claim is that the contract expressly authorized Defendants' assessment of two ATM fees for each non-Higher One ATM transaction.  As alleged in the CAC, the only document that could arguably be construed as a contract (the T&C) merely informed Plaintiffs that the ATM owner would charge a single ATM fee—it made no mention of a fee to be charged by Defendants.  The only potential mention of that fee was in the submerged Fee Schedules.  And nowhere did Higher One ever inform Plaintiffs that they would be systematically charged two fees for the same transaction.

Plaintiffs' good faith and fair dealing claim must also be allowed to stand because, contrary to Defendants' argument, Plaintiffs do not seek to vary the terms of the T&C.  Higher One was required to use its contractual discretion in good faith.  It did not.  The T&C said Higher One "may" charge overdraft fees; in reality, it was a systematic certainty that Higher One would charge these fees on students' protected financial aid funds every time it was given the chance.

**4**

Defendants also argue that Plaintiffs' conversion, statutory theft, and rescission claims should be dismissed.  As discussed above, Plaintiffs have adequately pled that no "meeting of the minds" occurred to form a valid contract, making rescission a proper remedy.  Lastly, Defendants' conversion and statutory theft arguments incorrectly construe Connecticut law as barring those causes of action with respect to funds held in bank accounts.  For these reasons, Defendants' motion to dismiss those claims must be denied.

## II.   STATEMENT OF FACTS

### A.   Defendants defaulted Plaintiffs into Higher One accounts.

Without Plaintiffs' authorization, Defendants acquired private information from Plaintiffs' education and financial records.  CAC, ¶¶ 47-48.  Defendants used this information to open bank accounts and distribute pre-loaded debit cards to Plaintiffs—without Plaintiffs' consent.  *Id.*, ¶ 49. Defendants thereby created a default that Plaintiffs had to opt-out of if they wished to use a different banking services provider to receive their financial aid money.  *Id.*, ¶ 51.

### B.   Higher One sent Plaintiffs deceptively "co-branded" debit cards.

Prior to the beginning of a semester, each Plaintiff received in the mail a Higher One debit card prominently emblazoned with the name and logo of Plaintiffs' respective colleges and universities.  *Id.*, ¶ 55.  Each Plaintiff believed these representations to indicate that his or her school endorsed or required Higher One's checking account as the best or only way to receive financial aid money.  *Id.*, ¶ 56.  Prior to the beginning of a term, each Plaintiff also received an email from Higher One stating that his or her college had "partnered with Higher

5

One to provide a new method for receiving financial aid disbursements" to all students. *Id.*, ¶ 58. Each Plaintiff stayed in the Higher One "default" because, in part, he or she believed use of the Higher One account was the only or best way to receive financial aid funds disbursed by his or her school. *Id.*, ¶ 60.

C.   **Higher One deceptively discouraged Plaintiffs from opting-out of their Higher One accounts by threatening delayed access to financial aid money.**

Plaintiffs were required to use Higher One's website in order to receive any financial aid refund. The site was co-branded with Plaintiffs' schools' logos. CAC, ¶ 64. Plaintiffs did not opt out of the default option because Defendants would have delayed access to their much-needed financial aid money if Plaintiffs had chosen other options. *Id.*, ¶ 65. Plaintiffs were each told that they would get their financial aid refunds "immediately" if they choose Higher One and that their financial aid disbursements would be delayed if they opted-out of the Higher One account default. *Id.*, ¶ 66. The reason this refund would be "delayed" is that Defendants intentionally made other options more time-consuming. *Id.*, ¶ 67.

D.   **Defendants purposely made it difficult for Plaintiffs to opt-out of the Higher One account by foreclosing other banking options.**

Defendants did not provide an electronic online option for Plaintiffs to deposit their financial aid refunds in another bank of their choosing. *Id.*, ¶ 74. Had direct deposit been available as an online option (and thus not come with an artificial time delay), Plaintiffs could have and would have used their existing bank accounts, and accounts at different banks, to deposit their financial aid funds. *Id.*, 75.

**E.    Higher One provided deceptive account disclosures to Plaintiffs and concealed the unconscionable and unusual fees associated with the accounts.**

Plaintiffs appended two documents to their CAC that purported to govern their relationship with Defendants.  The first document was the T&C and was attached as Exhibit B.  Defendants never provided the T&C to Plaintiffs in written form, and Plaintiffs were not required to view the T&C prior to electing their disbursement choices.  CAC, ¶¶ 82, 189.

The second document is entitled Fee Schedules, attached as Exhibit C.  The Fee Schedules was a separate document, and Plaintiffs could not view it without clicking a separate link from the T&C.  Even if a student clicked on that link, the fees at issue here were submerged, and could only be viewed if the student scrolled down to another page on the website, after reading through a page deceptively filled with all of the free services offered by Higher One.  CAC, ¶ 83.  As such, the fees at issue in this litigation were doubly submerged.  The Fee Schedules is the *only* place *any* reference to the PIN-Based Transaction Fee is made.  *Id.*, ¶ 83.  The Fee Schedules is the only place Defendants even arguably disclosed a Non-Higher One ATM Fee that they would charge (in addition to the fee charged by the ATM owner).  *Id.*, ¶ 92.

Defendants improperly attached a document to their Motion that was not referenced in the CAC.  MTD, at Exh. 2.  They argue, without allowing Plaintiffs any opportunity to test the sufficiency of the evidence, that the document "shows that Plaintiff Crockett was required to click 'I agree' to accept" the T&C.  MTD, at

6.  If anything, this document shows that reasonable internet users would activate their Higher One debit cards without viewing the Fee Schedules.

F.    **Higher One breached the contract when it charged two ATM fees for each non-Higher One ATM withdrawal.**

Plaintiffs (with the exception of Plaintiff Hannibal) paid two ATM fees for each ATM withdrawal they made from a non-Higher One ATM.  CAC, ¶ 88.  The only mention of a non-Higher One ATM fee in the T&C is a notification that the other bank may charge such a fee.  Nowhere in the T&C is there any suggestion that Higher One will charge its own fee for the use of a non-Higher One ATM.  *Id.*, ¶ 91.  In the Fee Schedules, which was submerged from Plaintiffs' view, one ATM fee is disclosed.  The Fee Schedules does not indicate that the ATM fee was being charged by Higher One.  *Id.*, ¶ 92.  Nowhere in either of these documents did Higher One ever inform Plaintiffs that they would be systematically charged two fees for the same ATM transaction.  *Id.*, ¶ 94.

G.    **By providing an extremely limited number of "in-network" ATMs, which themselves provide only limited hours and days of operation, Higher One made it impossible for Plaintiffs to avoid non-Higher One ATM Fees.**

The ATM fees are additionally oppressive because "in-network" Higher One ATMs are exceedingly rare, and are not available to students at all hours, on weekends, or during school vacations or holidays.  Therefore, Plaintiffs could not reasonably avoid such fees, and they were forced to use "out of network" ATM machines during these periods and when out of range of the very few in-network ATMs.  CAC, ¶ 97.  Higher One intentionally limits the number of "in-network" ATMs it provides in order to increase its ATM fee revenue.  *Id.*, ¶ 98.  Higher One intentionally limits the access hours of its "in-network" ATMs in order to increase

its ATM fee revenue.  *Id.*, ¶ 99.  Higher One concealed the fact of extremely limited access to Higher One ATMs from Plaintiffs at the time they were forced to choose whether or not to "opt-out" of a Higher One account.  *Id.*, ¶ 103.

Each Plaintiff (with the exception of Plaintiff Hannibal) was forced to use a non-Higher One ATM in order to access his or her financial aid funds because it was difficult or impossible for Plaintiffs to access the Higher One ATM(s) on their respective campuses at the time and place they needed to withdraw their financial aid funds.  *Id.*, ¶ 101.

**H.**    **By labeling its access device a "debit card," Higher One deceived Plaintiffs into incurring "PIN-Based transaction fees".**

The Higher One debit cards issued to Plaintiffs were boldly stamped with the word "DEBIT" on the front of the card and in two other places on the card. CAC, ¶ 111.  Yet each time Plaintiffs swiped the card as a "debit" and entered their PIN, they were charged a 50-cent PIN-Based Transaction Fee by Higher One. The only way to avoid that 50-cent fee on every purchase is to press "credit" at a sales terminal and sign the receipt.  *Id.*, ¶ 114.  Higher One did not adequately disclose this fact to Plaintiffs, mentioning the existence of the fees only in a doubly submerged portion of the Fee Schedules. Higher One also misled Plaintiffs by placing the term "debit" on the card and by referring to the "debit" MasterCard in its contract documents, when, in fact, Plaintiffs had to select the "credit" option in order to avoid the fee.  *Id.*, ¶ 115.  Further, at some merchants, students do not even have the choice of selecting the "credit" option.  *Id.*, ¶ 117. Each Plaintiff incurred PIN-based Transaction Fees because they were not aware they had to use the Higher One card as a "credit" card at the point of sale, or

because there was no option to select "credit" at the merchant, or for both reasons.  *Id.*, ¶ 120.  The vast majority of U.S. banks do <u>not</u> charge such a fee.  *Id.*, ¶ 122.

**I.    Defendants unlawfully charged overdraft fees on accounts used for financial aid funds and violated the covenant of good faith and fair dealing.**

Plaintiffs Price, Crockett, and B. Kent were charged overdraft fees by Defendants.  CAC, ¶ 124.  DOE regulations state that if a bank account is opened for a student to receive a financial aid disbursement, an entity cannot "subsequently convert the account, card, or device to a credit card or credit instrument."  34 C.F.R. § 668.164(c)(3)(vii).  Because Defendants allow students to overdraw their accounts and incur overdraft fees, Higher One debit cards are a "credit instrument."  CAC, ¶ 125.

Higher One reserved for itself the discretion as to whether or not to authorize overdraft transactions and to charge Overdraft Fees.  It had a duty to exercise that discretion fairly and refuse to charge overdraft fees on protected financial aid funds.  *Id.*, ¶ 128.  Instead, Defendants systematically approved and debited transactions which they knew would result in overdraft fees and which they knew would turn Plaintiffs' Higher One debit cards into credit access devices, in violation of federal regulations.  *Id.*, ¶ 129.

**J.    Higher One's practices and fees are outliers in the industry.**

The fees Higher One charges are unusual with respect to Higher One's peer companies in the field of student financial aid disbursement.  In many cases, Higher One's peer companies also refrain from using Higher One-like aggressive

efforts to default students into accounts and to pressure students not to opt-out of Higher One accounts.  *Id.*, ¶ 130-137.

K.   <u>Defendants violate federal public policy promulgated in the Higher Education Act, DOE regulations, EFTA and Regulation E.</u>

In their CAC, Plaintiffs describe numerous regulations that Defendants violate or undermine.  Plaintiffs are not seeking to use this conduct to create a private right of action under the regulations.  Rather, the violations are referenced only in the CUTPA and alternative consumer protection claims (and not in any of the other causes of action) because the violations are only meant to buttress Plaintiffs' contentions under the "unfair" or "unlawful" prongs of CUTPA and the consumer protection laws.  Moreover, none of the regulations cited in the CAC impose disclosure requirements relating to the terms of the students loans themselves—such as repayment terms, loan consolidation and rehabilitation, or interest rates.

Notably, Defendants have pointed to no regulations that authorize or permit the conduct that Plaintiffs complain of in the CAC.

### III.   <u>ARGUMENT</u>

A.   <u>Legal Standard.</u>

Upon a motion to dismiss pursuant to Fed. R. Civ. P. Rule 12(b)(6), the court must determine whether the plaintiff has stated a legally cognizable claim by making allegations that, if true, would show he is entitled to relief.  *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007).  The court takes the factual allegations of the complaint to be true, *Hemi Group, LLC v. City of New York,* 130

S.Ct. 983, 986–87 (2010), and from those allegations, draws all reasonable inferences in the plaintiff's favor.  *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009).

The plausibility requirement does not "require[] a complaint to include specific evidence [or] factual allegations in addition to those required by Rule 8." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 119 (2d Cir. 2010).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  *Twombly*, 550 U.S. at 563. Courts, therefore, do not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Id*.

**B.     The Higher Education Act does not expressly preempt any of Plaintiffs' claims.**

**1.     §1098g does not preempt this lawsuit because Plaintiffs' claims are not based on disclosures relating to the terms of any student loans.**

At the outset, it is important to note that the HEA has no provision expressly preempting state consumer protection, contract, or fraud laws.  *See, e.g., Coll. Loan Corp. v. SLM Corp., a Delaware Corp.,* 396 F.3d 588, 596 (4th Cir. 2005) ("The doctrine of express preemption has no application here (as the parties agree), because the HEA makes no mention of preempting state tort and contract claims."); *Cliff v. Payco Gen. Am. Credits, Inc.*, 363 F.3d 1113, 1125 (11th Cir. 2004); *Morgan v. Markerdowne Corp.*, 976 F. Supp. 301, 318 (D.N.J. 1997).

While the HEA does preempt particular *subjects* of state law, those preemption provisions must be read narrowly and cannot be construed to preempt causes of action that are not expressly identified.  "Such reasoning is a variant of the familiar principle of expression *unius est exclusio alterius*:

Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."  *Cipollone v. Liggett Grp., Inc.,* 505 U.S. 504, 517 (1992); *accord Keams v. Tempe Tech. Inst., Inc.*, 39 F.3d 222, 225 (9th Cir. 1994) (holding that express provisions in the HEA which preempt state law necessarily "imply that Congress intentionally did not preempt state law generally, or in respects other than those it addressed").

Defendants argue that Plaintiffs' state consumer protection act, conversion, unjust enrichment, and statutory theft claims are expressly preempted because "[t]he HEA contains a provision expressly preempting 'any disclosure requirements of any State law.'"  MTD, at 11.  Defendants do not tell this Court that the full text of this provision, 20 U.S.C. § 1098g, is much more limited: "Loans made, insured, or guaranteed pursuant to a program authorized by title IV of the Higher Education Act of 1965 . . . shall not be subject to any disclosure requirements of any State law."

By its plain terms, then, the HEA's express preemption provision does not concern any of Plaintiffs' claims because those claims are not based on disclosure requirement of any student loans.  The claims, do not, for example, concern the making of student loans, the repayment of student loans, disclosure of student loan conditions, interest rates on student loans, or deferment options on student loans.  Plaintiffs' complaints about PIN Transaction Fees and ATM Fees have nothing to do with "loans made" or disclosures about those loans.  It would be improper to apply that clause's express preemption of disclosures related to lending activities to activities not even referenced in that clause.

13

In *Genna v. Sallie Mae, Inc.*, 11 CIV. 7371 LBS, 2012 WL 1339482 (S.D.N.Y. Apr. 17, 2012), the court refused to apply §1098g to preempt claims relating to a lender's collection activity.  "Sallie Mae argues that state law claims must be preempted lest they interfere with the levers and pulleys of the federal statutory scheme.  But this argument cuts too broad a swath."  *Genna*, 2012 WL 1339482, at *9.  That court said debt collection and loan servicing are "separate activities," and express preemption of claims relating to improper lending disclosures does not govern other activities, including collection activities.  Similarly here, §1098g's concern with student *lending* cannot be extended to improper debit card fees simply because some fees are imposed on loan proceeds.

Defendants' argument that Higher One is a "third-party servicer" of student loans is a red herring.  It is true that lenders may assign their loans to "third-party servicers," in which case the loan servicer must also abide by federal regulations.  *See* 20 U.S.C. § 1082(a)(1); 34 C.F.R. §§ 682.203,682.700(a).  Certain activities of those student loan third party servicers might then be included in the scope of the express preemption clause.  *See Chae v. SLM Corp.*, 593 F.3d 936, 939 (9th Cir. 2010).  But that express preemption only applies to the disclosures relating to the loans themselves.  Therefore, a third-party servicer may not invoke preemption with respect to claims that do not seek to impose additional disclosure requirements relating to the lending or servicing of student loans.  As the *Genna* court found, "[t]here is nothing in the HEA that standardizes or coordinates how a customer service representative of a third-party loan servicer like Sallie Mae shall interact with a customer like [plaintiff] in the day-to-day

**14**

servicing of his loan outside of the circumstance of pre-litigation informal collection activity.  Sallie Mae has not shown that § 1098g, or anything else in the HEA, expressly preempts [plaintiff's] claims."  *Genna*, 2012 WL 1339482 at *8.

Higher One's debit card disbursement activities are exponentially more attenuated from Plaintiffs' underlying student loan obligations than the "day to day" servicing at issue in *Genna*.  Indeed, unlike the defendant in *Genna*, Higher One has nothing to do with Plaintiffs' underlying student loan obligations.  Defendants' tie to student lending is only that they deposit financial aid refunds— only some of which are the *proceeds* of student loans—into debit card-linked checking accounts.  Therefore, Defendants cannot even be said to be "servicing" any aspect of Plaintiffs' student loans.  Their activities are not included in the scope of 1098g's express preemption provision.

The only cases Defendants cite for the proposition that their activities are shielded by the express preemption clause are cases that concern allegations of improper disclosures of the terms of federal student loans.  For example, *Linsley* concerns default options under a student loan.  There, the plaintiff's claims were "predicated on FMS's failure to properly disclose the HEA's requirements for loan consolidation and rehabilitation."  2012 WL 1309840, at *6.  Because those activities directly concerned the loan obligation; because the DOE had prepared specific disclosures and forms for the servicer to use; and because the servicer's activities plainly fell within the scope of the HEA express preemption provision, this Court found "[plaintiff's] CUTPA claim is . . .  subject to express preemption under Section 1098g."  *Id.,* at *4.

Here, Plaintiffs' underlying loan obligations are entirely unaffected by the Higher One activities Plaintiffs challenge. Plaintiffs have to repay their student loans, abide by the interest rate set on promissory note, and avail themselves of deferment options specified by HEA and its implementing regulations—regardless of whether those loan proceeds are deposited into a Higher One account, an account at a different bank, or no bank account at all. Unlike the plaintiff in *Linsley*, Plaintiffs here are not in any way challenging disclosures made relating to the making or processing of their loans. Their allegations are based on conduct relating to the operation of bank accounts that, in part, happen to hold the funds from those loans.

The two other cases Defendants rely upon even more directly concern student lending, as they feature the quasi-governmental student lender Sallie Mae itself as defendant. In *Brooks v. Salle Mae, Inc.,* CV-096002530-S, 2011 WL 6989888 (Conn. Super. Ct. Dec. 20, 2011), a student challenged disclosures regarding student loan payment deferments. Sallie Mae itself made or consolidated the student loans at issue—activities falling within the core of 1098g's express preemption provision—and was the actual holder of plaintiff's student loans. As this Court noted in *Linsley*, the court in *Brooks* held that claims relating to processing practices—as opposed to disclosures—were "not preempted." *Linsley*, 2012 WL 1309840, at *5. Similarly, Plaintiffs' claims have nothing to do with their underlying loans or the terms of those loans.

Defendants also rely upon the Ninth Circuit's decision in *Chae*. In *Chae*, Sallie Mae was allegedly "using billing statements and coupon books that trick

borrowers into thinking that interest is being calculated via the installment method when Sallie Mae really uses a simple daily calculation." *Chae.*, 593 F.3d at 942 (citation omitted).  The Ninth Circuit held that borrowers' California contract and consumer-protection law claims were preempted by the HEA because they amounted to claims that a lender failed to properly disclose terms relating to student loans.  This case does not involve any such disclosures relating to the terms of the loan or any loan servicing issues.  Unlike in *Chae*, Plaintiffs here make no allegations relating to interest rate, repayment schedules, or any disclosures relating to the terms of the loan or repayment of the loan.

 Defendants cannot analogize Higher One to the lenders and loan servicers in *Brooks*, *Linsley*, or *Chae*, because Higher One performs none of the same functions.  Nor can it bootstrap its attenuated connection to student loan transactions into an HEA preemption clause that does not even cover financial aid delivery or disbursement.  Higher One cannot show that Congress intended delivery of financial aid funds into debit card accounts to be subject to HEA preemption.  Defendants betray this reality when they argue that "the express preemption provision exists because Congress and the DOE specified detailed disclosure requirements that lenders and institutions . . . must make *in connection with student lending*."  MTD, at 11 (emphasis added).  Plaintiffs' claims are not expressly preempted because Plaintiffs are *not* complaining about disclosures associated with student lending.

2.    **HEA regulations do not address the content of the Higher One disclosures.**

Defendants also argue that the HEA's express preemption provision—which does not include aid delivery or disbursement among its topics—should be extended by this Court to shield their activities because of purportedly "detailed disclosure requirements that lenders and institutions (and, by extension, third-party servicers like Higher One) must make in connection with student lending." MTD, at 11.  In fact, the regulatory scheme Defendants invoke is not "detailed" with respect to the debit card activities that Plaintiffs challenge.  Not one DOE regulation guides Higher One on the content of account disclosures; not one DOE regulation specifies the representations made on debit cards or in marketing materials; not one DOE regulation guides the form or content of Higher One's Fee Schedules.  Instead, Defendants strain to identify a total of three HEA provisions that supposedly govern their "disbursement" activities: 20 U.S.C. 1083, 34 C.F.R. §§668.164-165, and a "Dear Colleague" letter from the DOE.  These regulations barely touch upon aid delivery or disbursement by third parties, and make no reference at all to debit card disbursement accounts or related disclosures.  In no way do they establish disclosure requirements that relate to the conduct at issue in this case.

The first statutory provision Defendants rely on for the proposition that the HEA and its regulations govern their debit card disbursement activities is 20 U.S.C. § 1083.  But the disclosures mandated in those regulations are directly aimed at the activities of student loan lenders (and the third-party servicers of loans made by those lenders)—not the activities of a company like Higher One,

which has no connection to the underlying student loan obligation. Defendants have not made and need not make any of these disclosures, because they are not lenders and perform none of these functions.

Defendants next rely on 34 C.F.R. §668.164-165, that purportedly "set forth the requisite notices and authorizations an institution or servicer must make when disbursing" financial aid funds. MTD, at 11. But, again, those regulations do no such thing. First, those regulations represent DOE guidance to institutions of higher learning, not servicers. Not surprisingly, then, they contain no regulations about debit card disbursement procedures by entities like Higher One. For example, 34 C.F.R. §668.164 deals almost exclusively with the timing of the disbursement of loan proceeds, but only tangentially address Higher One's debit card distribution activities. 34 C.F.R. §668.164(c)(3)(ii) is the most specific provision, but even its guidance says only *when* a disbursement account disclosure must be made ("before an account is opened"), not *what* such a disclosure is supposed to contain. As Defendants point out, 34 C.F.R. §668.164(c)(3)(vii) states that a debit card cannot be made into a credit access device, but establishes no disclosure requirements. Another section Defendants rely on, 34 C.F.R. §668.165, relates to how students may cancel requests for student loans or for grants—again, something irrelevant to Higher One's activities.

Finally, Defendants rely on a "Dear Colleague Letter," GEN-12-08. First, the letter is not even directed at third party entities like Higher One; rather, the letter provides "guidance to *institutions* that use contractors to deliver title IV credit

balances to their students" and "reminds *institutions* of their responsibilities" when doing so.  On its face, the letter does not apply to the contractor-deliverers themselves (like Higher One).  Further proof that the letter is not directed at entities like Higher One comes from the fact that the plain terms of the letter urge institutions to proactively help students *avoid* predators like Higher One: "It may be advisable for the institution to encourage its incoming students to open an account at a financial institution *of their own choosing* before classes start, or require students to provide information to the institution about *their existing bank account where the institution can make credit balance payments cheaply and expeditiously via electronic funds transfers to those accounts*."  Dear Colleague Letter (emphasis added).  *Cf.* CAC, ¶ 75 (alleging that Plaintiffs would not use Higher One for delivery of funds if allowed to use existing bank account).

Assuming that this advice applied not only to institutions but also to the contractors, such as Defendants, it still would not provide a basis for express preemption.  The only express preemption provision arguably at issue, §1098g, does not in any way bear upon these types of disclosures.  Again, that provision preempts state law claims based on allegations that disclosures relating to the terms of a student loan violate state law.  Separate guidance suggesting what should be done with respect to debit cards does not transform the allegations in this case to claims that Defendants are making unlawful disclosures about the terms of the loans—which is all that is preempted by §1098g.

In sum, unlike the specific provisions and student disclosures drafted by DOE that were at issue in *Brooks*, *Linsley*, and *Chae*, none of the provisions Defendants rely on concern disclosures regarding the terms of the loan.

C.    <u>The HEA does not "impliedly preempt" any of Plaintiffs' state law claims because there is no "method-of-enforcement" conflict here.</u>

Defendants claim conflict preemption precludes Plaintiffs' claims.[1]   Yet, Defendants identify no actual conflict with the HEA.  Instead, Defendants argue that "Congress intended to provide the DOE with the exclusive power to interpret and enforce the HEA's provisions," MTD, at 15, and that allowing Plaintiffs' consumer protection law claims to go forward "would pose an obstacle to the accomplishment of Congress's goal of uniform federal enforcement of the HEA by DOE." *Id.*  Defendants call this "method-of-enforcement preemption." *Id.*, at 18.  Their principal support for this argument is *Arizona v. United States*, 132 S. Ct. 2492, 2505 (2012).  In *Arizona*, the State provided criminal liability to undocumented aliens for acts that were subject to a strict federal regulatory framework established by the Immigration Reform and Control Act of 1986. *Id.* The Court found conflict preemption because this legislative history of ICRA made it clear that "Congress decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment." *Id.*, at

---

[1] Though Section II of Defendants' Motion to Dismiss is entitled "Counts One and Two are Impliedly Preempted," Defendants do not appear to argue for field preemption.  Nor could they, since "[i]t is apparent . . . that Congress expected state law to operate in much of the field in which it was legislating." *Keams*, 39 F.3d at 225–226.

2496.  That is a far cry from determining that conflict preemption exists because a federal statute (the HEA) does not have a private right of action.

Defendants also claim that the D.C. Circuit's decision in *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1369 *opinion amended on denial of reh'g,* 177 F.3d 1036 (D.C. Cir. 1999) "applied this method-of-enforcement type preemption in the context of the HEA."  MTD, at 18 (citing *Armstrong,* 168 F.3d at 1369).  That is a misreading of the *Armstrong* decision.  The D.C. Circuit held that the plaintiff could not void her student loan. This was because her school misrepresented its accreditation.  It based its holding on the fact that the DOE had expressly stated that accreditation does not affect the enforceability of the loan, but only a schools eligibility for federal aid. *Armstrong*, 168 F.3d at 1369.  Further, plaintiff's claims directly implicated the central HEA concern with student loan availability.  *Id.*  Accordingly, the cause of action was an obstacle to the purposes and objectives of HEA.  That holding has no applicability here, where DOE is silent and where Plaintiffs' claims have no impact on student lending.

In any event, Courts have explicitly held that the existence of HEA regulations does not preclude private enforcement of subjects covered by those regulations:

> Nor does the fact that only the Secretary is authorized to enforce the HEA compel the conclusion that College Loan's pursuit of its state law claims, relying in part on violations of the HEA or its regulations, will obstruct the federal scheme.  To the contrary, the Supreme Court (and this Court as well) has recognized that the availability of a state law claim is even *more* important in an area where no federal private right of action exists.

*Coll. Loan Corp.*, 396 F.3d at 598 (citations omitted) (emphasis added).

Defendants cannot identify any HEA objective for "uniform enforcement" by the Secretary of Education that would exclude all state law remedies.  To the contrary, the HEA regulatory scheme contemplates civil actions, something several courts (including this one) have noted.  Just as Defendants could not identify a single court that has held the §1098g express provision applies to claims *unrelated* to the direct lending or administration of student loans, so too they cannot identify any case holding that the Secretary's HEA enforcement authority preempts *all* state law causes of action.  To the contrary, courts routinely permit private actions that concern areas the HEA regulates.

For example, this Court's decision in *Parola v. Citibank (S. Dakota) N.A.*, 894 F. Supp. 2d 188 (D. Conn. 2012)—which Defendants improperly cite for the proposition that Plaintiffs could not pursue a state-law remedy for an alleged HEA violation "that had specific statutory and regulatory consequences," MTD, at 19— is instructive.  In that case, a student claimed she was improperly deprived of the ability to lower her monthly loan payment amounts pursuant to an income-based adjustment.  *Parola,* 894 F. Supp. 2d at 195.  Far from finding it was the Secretary of Education that had the "exclusive" authority to enforce the alleged violations, this Court analyzed in detail the plausibility of plaintiff's CUTPA claims, including whether the prongs of the "cigarette rule" were met and whether ascertainable loss was properly alleged.  *Id.*  This Court never once indicated that preemption was even a concern—even in a case squarely concerned with the administration of a student loan.  In other words, *in Parola, this Court did precisely what*

***Defendants now argue it never can***: interpret HEA regulatory provisions and determine whether specified conduct violated the HEA.

Similarly, in *Cliff*, the Eleventh Circuit rejected defendant's "contention that permitting a private cause of action would undermine Congress's enforcement scheme [which] relies on the authority vested in the Secretary of Education." 363 F.3d at 1128. In that case, the Secretary had "expressed the belief that a private cause of action is not only consistent with Congress's enforcement scheme, but a necessary part of it." *Id*. Indeed, it found that the HEA enforcement scheme and plaintiff's state consumer protection claims "work in tandem." *Id.*, at 1127.

Ignoring the authority above, Defendants put misplaced reliance on this Court's decision in *Linsley*, 2012 WL 1309840. While it is true that this Court dismissed the plaintiff's CUTPA allegations based on express preemption, it is also true that this Court also ultimately <u>certified</u> a class of borrowers based on the same allegations that a debt collector misrepresented HEA requirements and therefore violated the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692, *et seq*. *Linsley v. FMS Inv. Corp.*, 288 F.R.D. 11, 18 (D. Conn. 2013).

Defendants also rely upon 34 C.F.R. §§668.81-91 for the proposition that "Congress and the DOE have determined that violations of the HEA by third-party servicers should by enforced by the DOE, itself, not by students through private civil actions." But those regulations—concerned with hearing and appeals procedures—say nothing of the sort.

Defendants argue that Plaintiffs cannot "support their CUTPA or other state consumer protection claims based on" certain alleged violations of HEA

regulations.  MTD, at 21.  Defendants also argue that "Plaintiffs' consumer-protection claims in Counts One and Two depend upon a finding that Defendants violated HEA and its implementing regulations."  *Id.*, at 19.  First, no Plaintiffs' consumer protection claims are wholly "predicated on" violations of the HEA or of DOE regulations.  Unlike the situation in *Chae* and other cases, where plaintiffs alleged that defendants violated state law even though they complied with federal law, there is no "conflict" when Plaintiffs allege that Defendants did not comply with federal law or regulation.  Second, "the courts have generally authorized state tort claims to be pursued in areas where the federal government has regulated, even when such claims are in some manner *premised on* violations of federal regulations,"  *Coll. Loan Corp.,* 396 F.3d at 598-99 (emphasis added) (citing *English v. Gen. Elec. Co.,* 496 U.S. 72, 85 (1990).  Even for claims premised on HEA violations, state law claims are not barred.

As outlined in the Statement of Facts, Plaintiffs allege that Defendants collectively delivered a one-two-three punch to Plaintiffs that violated their statutory and common law rights: (1) Defendants defaulted Plaintiffs into a Higher One account without their consent; (2) Defendants made misrepresentations, omissions, and foreclosed other banking options in order to inhibit Plaintiffs from opting out of that default; and (3) Defendants charged Plaintiffs unconscionable and deceptive bank fees that were not disclosed to them.  Each is independently actionable without reference to any federal law or regulation.  *In addition*, some of this conduct offends both public policy and several federal laws and regulations.  But none of the allegations regarding Defendants' tripartite debit card

disbursement process are premised only on HEA violations.

A CUTPA violation can be established by showing either a stand-alone deceptive practice or an act that amounts to a violation of public policy. *Cheshire Mortgage Services, Inc. v. Montes*, 223 Conn. 80, 105-06, 612 A.2d 1130, 1143 (1992). An act is considered deceptive if it has the tendency or capacity to deceive. *Shell Oil Co. v. Wentworth*, 822 F. Supp. 878, 884-885 (D. Conn. 1993). Plaintiffs' CUTPA claim (as well as their alternative California Unfair Competition Law claims) alleges both that Defendants' violations of the HEA implicate those laws' "unfairness" or "unlawfulness" prongs <u>and</u> that Defendants' conduct is, on its own, deceptive, without reference to violation of other statutes or regulations. *See* CAC, ¶ 183 ("Defendants' policies and practices as alleged herein constitute 'deceptive trade practices' under CUTPA because the policies and practices have a tendency and capacity to deceive consumers."). Only Plaintiffs' claims based on consumer protection statutes' unlawful or unfairness prongs are even arguably "premised on" this Court finding HEA violations. Plaintiffs' other "deceptive practices" allegations are independent of HEA violations.

Therefore, even if the Court found that claims "predicated" on violations of the HEA were in fact preempted (it should not), that would simply eliminate "unfairness" or "unlawful" claims based on the HEA—but could not eliminate the CUTPA or alternative consumer protection  claims altogether.

**D.**     <u>Plaintiffs have met Rule 8(a) pleading standards with respect to all claims.</u>

Defendants argue that several of Plaintiffs' claims fail to meet Rule 8(a) pleading standards, arguing that "Plaintiffs plead nothing about their own

individual experiences."  MTD, at 22 and "plead no facts relevant to their actual circumstances."  MTD, at 24.  To the contrary, the CAC painstakingly describes each stage of the uniform financial aid delivery and debit card account-opening process to which each Plaintiff was subjected.  Every one of the dozens of allegations regarding Defendants' debit card account disbursement activities is an "actual circumstance" relevant to each Plaintiff.  The CAC further details how these uniform practices individually caused damages to each of the individual Plaintiffs.  CAC, ¶¶ 19-30.  Those paragraphs state, for each Plaintiff, detailed causation allegations, such as "due to the extremely limited number of Higher One ATMs provided, [Plaintiff] was forced to use non-Higher One ATMs to access her financial aid money; and because [Plaintiff] was not properly informed that she was required to use her Higher One card as a 'credit' card at the point of sale, or because there was no option to select 'credit' at the point of sale."  *Id.*  This detail for each named Plaintiff is far from "conclusory."  To the contrary, each Plaintiff has alleged personal and specific causation.  Combined with Plaintiffs' other allegations of uniform deceptive practices, the allegations far exceed Rule 8(a) pleading minimums.

Still, Defendants complain about those allegations, arguing that "the language of each paragraph in that section varies only to the extent that the Plaintiffs incurred different types of fees."  MTD, at 22.  That the allegations are similar for each Plaintiff is as one would expect, since, again, Defendants used uniform practices.  That is why this case was brought as a class action.

Defendants additionally argue that a handful of Plaintiffs' allegations are "implausible." *Id.* But "[a] claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 678 (citation omitted). The plausibility standard is not a "probability requirement." *Id.* "[I]t simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence" supporting a plaintiff's claim for relief. *See Twombly,* 550 U.S. at 556. Still, Defendants ask this Court to essentially determine that Plaintiffs' allegations are "probably" not correct—in direct contravention of *Iqbal.* In any event, each allegation Defendants challenge is more than probable:

- Defendants argue that it is implausible for Plaintiffs to allege that Defendants opened accounts without their consent. MTD, at 22. But Plaintiffs specifically allege that Defendants sent each plaintiff a functional debit card prior to any "consent" by Plaintiffs, complete with an account number and unique personal information. *See inter alia*, CAC, Section F.

- Defendants argue that Plaintiffs have failed to allege the defects in the T&C and Fee Schedules. MTD, at 23. But there are entire sections of the CAC dedicated to doing precisely this. *See e.g.*, CAC, ¶¶ 6, 19-30, 41, 82-86.

- Defendants argue that Plaintiffs have failed to specifically allege that ATM access is limited at their schools. MTD, at 23. That is just false. Each Plaintiff who incurred a non-Higher One ATM Fee alleges that "because, due to the *extremely limited number of Higher One ATMs provided*, [Plaintiff] was forced to use non-Higher One ATMs to access her financial aid money." CAC, 19-30 (emphasis added).

- Defendants argue that certain Plaintiffs have failed to allege, with respect to Overdraft Fees, that they incurred those fees "because their accounts were actually permitted to be overdrawn." MTD, at 23. That is irrelevant. Each was charged an overdraft/insufficient funds fee on an account funded with financial aid money. That violates the federal regulation prohibiting Plaintiffs' accounts from being turned into devices that have the potential

28

to access credit.  Further, Higher One used its contractual discretion to charge a fee every time a student overdrew or attempted to overdraw an account—even though it only said it "may" charge a fee.

After having identified these few, easily-disposed-of examples—out of a highly detailed, 70-page complaint—Defendants then proceed to pronounce that "Plaintiffs simply do not plead adequate facts to plausibly support their claims or to permit Defendants to defend."  MTD, at 23.  This is a grand overstatement. Defendants' selective focus on a few allegations cannot be the basis for the dismissal of entire claims.  This is massively different from the situation in the cases Defendants cite.  In *Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Centers Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.,* 712 F.3d 705 (2d Cir. 2013), an ERISA case, plaintiffs failed to "allege *any* facts regarding the process by which Morgan Stanley selected the securities" at issue.  712 F.3d 705 (emphasis added).  In the instant matter, however, Plaintiffs provide detailed allegations as to Defendants' deceptive practices and how those practices deceived Plaintiffs and caused damages.

Lastly, Defendants argue that Plaintiffs' alternative, Count II consumer protection act claims (alleging violations of other state consumer protection statutes), are inadequately pleaded.  MTD, at 24.  Those claims are pleaded in the alternative, in the event that, pursuant to Defendants' Motion to Strike, Plaintiffs' national CUTPA class action claims are stricken.  The CUTPA claim is, of course, extremely detailed.  CAC, ¶¶ 177-204.  The alternative consumer protection act claims incorporate those allegations.  *Id.*, ¶ 205.  Therefore, they are also, by incorporation, extremely detailed.  Because Defendants do not argue under Rule

8(a) that the CUTPA claim is inadequately pleaded, and because the elements of the CUTPA claim are incorporated into the alternative consumer protection law causes of action, Defendants cannot assert that they have not been put on notice of the claims made against them in the other consumer protection claims.

Defendants' citation to this Court's decision in *Davis v. Connecticut Cmty. Bank, N.A.,* 3:10CV261 VLB, 2013 WL 1296473 (D. Conn. Mar. 26, 2013) is unavailing.  First, that decision was at the summary judgment stage, where a full factual record existed.  Second, in *Davis*, plaintiffs provided no specificity in their CUTPA allegation, merely incorporating their entire complaint in general: "Plaintiffs assert that their CUTPA claims are predicated on every single one of their other claims previously pled in their amended complaint such as their breach of contract, breach of fiduciary duty, conversion and theft claims as indicated by the fact that all their prior allegations were expressly incorporated into their CUTPA claim in the amended complaint."  *Davis*, 2013 WL 1296473 at *15.  As such, the Plaintiffs' CUTPA allegations "fail[ed] to identify which acts of the Bank offend what public policy as established by which statutes or common law or other established concept of unfairness."  *Id*.  That infirmity does not plague Plaintiffs alternative consumer protection claims, for the simple reason that the well-pleaded CUTPA allegation properly identifies the basis for both "deceptive practices" and "unfair/unlawful" practices.  Moreover, the alternative California UCL claim makes the additional allegations required under that statute, in addition to incorporating the CUTPA allegations.  CAC, ¶ 207 (a)-(h).

30

If, however, this Court finds that Plaintiffs' alternative consumer protection claims are inadequately pleaded, any dismissal should be without prejudice, and Plaintiffs should be provided the opportunity to replead those claims.

**E.**     **Defendants improperly ask this Court to selectively dismiss certain allegations.**

Defendants argue that "certain allegations upon which Plaintiffs rely to support [the CUTPA and alternative consumer protection act claims] do not, as a matter of law, rise to the level of unfair or deceptive practices necessary to sustain those claims." MTD, at 11. Defendants then ask this Court to dismiss four *allegations* (not claims), regarding (1) "cobranding;" (2) charging for access to financial aid funds in violation of federal regulation; (3) labeling the students cards' with the word "DEBIT"; and (4) violating the E-Sign Act. But this Court should not engage in this exercise. Contrary to the analysis Defendants invite this Court to undertake, it is well-settled that a complaint must be read "as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594 (citing *Vila v. Inter-Am. Inv., Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009)). There is no recognized mechanism for a court in a Rule 12(b)(6) proceeding to dismiss individual allegations, as Defendants improperly ask the Court to do here.

In the interest of completeness, however, Plaintiffs will briefly respond to Defendants' criticism of each of the four challenged allegations.

1.    **Plaintiffs plausibly allege that "cobranding" and "partner"
      representations were deceptive.**

Defendants argue it was not deceptive for Higher One to tout itself as a
"partner" of Plaintiffs' colleges.  Higher One may well be a college's "partner" for
purposes of disbursement; that is beside the point.  What Plaintiffs challenge is
Higher One's representation that the glow of such a "partnership" extended to
Higher One's debit card and checking account offerings.  Plaintiffs allege Higher
One intentionally tried to confuse students into believing their school's decision
to "partner" with Higher One extended to a recommendation to students on which
checking account to choose.  Each Plaintiff has individually alleged that he or she
"believed these representations to indicate that his or her school endorsed or
required Higher One's checking account as the best or only way to receive
financial aid money.  CAC, ¶ 56.  Without any basis, Defendants ask this court to
find that each of Plaintiffs' sworn beliefs are implausible.  There is no basis for
such a ruling, especially at a stage where there is no factual record.

With respect to "cobranding," Higher One relies upon the Dear Colleague
Letter discussed at length in Section B2, *supra*, for the proposition that "there are
no prohibitions on co-branding," MTD, at 11.  But that advisory, non-binding letter
actually says: "Can a debit card provider participate with an institution by
displaying each entity's logo on either the student's school identification card or
*single-use* debit card?"  Answer: "Currently there are no title IV prohibitions
disallowing the debit card provider and the institution from displaying their
respective logos on either the student's identification card or debit card."  This
guidance is inapplicable on its face because the Higher One debit cards are not

"single-use."  But even if it were applicable, the *lack of a prohibition* is not tantamount to a "free pass" to use a school's logo limitlessly.  Plaintiffs plausibly allege that the logoed debit cards, combined with the high pressure disbursement choice process described elsewhere in the CAC, worked to deceive students and to enhance the pressure they were already under not to opt-out of the Higher One "default" for financial aid delivery.

> 2.   **Plaintiffs plausibly allege that Defendants charged fees to access financial aid funds in violation of federal regulation.**

Defendants argue that they do not charge a fee for opening an account, and therefore that Plaintiffs' allegations that they were charged fees to access their own financial aid money are implausible.  But Defendants' semantic parsing cannot obviate the fact that students are charged fees for access to their own financial aid money as soon as the Higher One account is open.  Indirectly or directly, Plaintiffs paid money to Higher One to access their protected financial aid funds.  This violates HEA policy.  Indeed, the very same Dear Colleague Letter Defendants rely upon extensively in other contexts states that "regardless of how students receive their title IV credit balance funds, an institution, and any third-party servicer, *is prohibited from charging a fee for delivering those title IV funds*" (emphasis added).  Plaintiffs allege Defendants charge fees for delivery of financial aid funds via PIN-based Transaction Fees, Non-Higher One ATM Fees, and Overdraft Fees.  That those bank fees are not charged at the time of account opening does not cure Higher One's violation of this public policy.  Higher One's delayed assessment of the inevitable fees does not put Defendants into compliance with the federal policy prohibiting fees to access financial aid money.

33

**3.    Plausibly allege that placing the word "DEBIT" on students' cards, and failing to disclose a fee for using the card as a debit card, was deceptive.**

Plaintiffs allege that "Higher One did not adequately disclose [PIN-Based Transaction Fees] to Plaintiffs, and misled Plaintiffs by placing the term 'debit' on the card and by referring to the 'debit' MasterCard in its contract documents, when, in fact, Plaintiffs had to select the 'credit' option in order to avoid the fee."  CAC, ¶ 116.  Defendants ask this Court to decide, without any factual record, that it cannot possibly be deceptive to call a "debit" card "what it is," MTD, at 31, then to charge a 50-cent fee every time a student uses it as a debit card.  Defendants tout the purported fact that Higher One gave "straightforward" instructions on how to avoid the PIN-based Transaction Fee in the Fee Schedules.  What Defendants do not tell this Court, however, is that the PIN-Based Transaction Fee was mentioned nowhere in the T&C.  It was mentioned in a doubly-submerged portion of the Fee Schedules only accessible by hyperlink embedded in the digital T&C—and even then only disclosed if a student scrolled down to the bottom of that particular web page.  CAC, ¶ 83.

Plaintiffs plausibly allege that the word "DEBIT," along with a contract that nowhere specified that a PIN-Based Transaction Fee would be charged,  deceived them.  There is no basis for this Court to discredit Plaintiffs' sworn allegations that they each "incurred PIN-based Transaction Fees *because* they were not aware they had to use the Higher One card as a 'credit' card at the point of sale, or because there was no option to select 'credit' at the merchant, or for both reasons."  CAC, ¶ 121.

4.      **Plaintiffs' E-Sign Act allegation is well-plead, not as an independent basis for relief under CUTPA, but as a supporting fact for other violations.**

Plaintiffs allege the E-Sign Act, 15 U.S.C. 7001, *et seq.*, permits electronic writings to substitute for legally required paper writings if certain procedures are followed.  Plaintiffs allege Higher One failed to follow those procedures.  Defendants complain that Plaintiffs' allegations regarding violations of the federal E-Sign Act lack an ascertainable loss component.  MTD, at 32.  But Plaintiffs never claim that the E-Sign claim gives rise to an independent claim under CUTPA.  Rather, the E-Sign violation merely bolsters their other claims.  It need not, therefore, support a CUTPA ascertainable loss allegation on its own.

F.      **Plaintiffs may maintain a claim for unjust enrichment.**

Here, Plaintiffs maintain (first and foremost), that the $0.50 PIN fees and the out of network fees were not part of any valid contract.  These fees were only mentioned in the separate Fee Schedules, and even then only at the bottom of a scrollable document.  In an analogues situation, the Second Circuit in *Specht v. Netscape Communications Corp.,* 306 F.3d 17, 23, 32 (2d Cir. 2002) (Sotomayor, J.) found such submerged terms unenforceable.  In *Specht*, a license agreement was located in text not visible to users on the "Download" page.  Instead, "[u]sers would have had to click onto a hyperlink, which would take the user to a separate webpage . . . Only on that webpage was a user informed that the user must agree to the license terms before downloading a product.").  *Id.*, 23.  Even if the user found the license agreement, she would have had to have scrolled down to view the terms, which were not immediately displayed.  *Id.*  The panel held that under

these facts, plaintiffs could not be found to have assented to the contract terms: "where consumers are urged to download free software at the immediate click of a button, a reference to the existence of license terms on a submerged screen is not sufficient to place consumers on inquiry or constructive notice of those terms. *Id.*, 32.

While the *Sprecht* panel did allow a second, separate "clickwrap" agreement to stand, that was only because, with respect to that agreement only, it found that customers "were automatically shown a scrollable text of that program's license agreement[.]" *Id.* at 21–22 (emphasis added). But here, Plaintiffs were neither affirmatively presented with the Fee Schedules nor required to click through it. Indeed, even when Defendants improperly try to argue facts in their Motion, they merely argue that one Plaintiff "was required to click 'I agree' to accept" the T&C—but not that a reasonably prudent internet user would have viewed the separate Fee Schedules before doing so. MTD, at 6.

Indeed, the very essence of a clickwrap agreement is that it "collect[s] all of the terms of the agreement in a *single dialog box* and then require[s] the user to affirmatively accept the agreement before proceeding." This is a process that "*makes every term equally visible.*" *Syndicate 1245 at Lloyd's v. Walnut Advisory Corp.*, CIV.A. 09-1697, 2011 WL 5825979 (D.N.J. Nov. 16, 2011) (emphases added). That is not the case here. The Fee Schedules was separate from the T&C, and not "equally visible" with the terms in the T&C—the latter which being the only document that required assent.

As the *Sprecht* panel concluded that "a reference to the existence of license terms on a submerged screen [meaning a screen that is out of view unless the user 'scrolls down'] is not sufficient to place consumers on inquiry or constructive notice of those terms." *Sprecht*, 306 F.3d at 32.  The relevant provisions of the Fee Schedules were classic "submerged" terms.  In fact, they were submerged *twice*.  First, no reference to the Fee Schedules is made anywhere on the "I Accept" page.  As in *Sprecht*, the only reference to Fee Schedules was located in text not visible to users on the "I Accept" page.  It was merely "hyperlinked" from the T&C.  *Cf. Sprecht*, 306 F.3d at 24.  Worse, once a user eventually found her way to the Fee Schedules, the fee information was only available for users who scrolled down to the next screen, the second submersion.  *Id.* at 23, 31-32.   In these circumstances, this Court should make the same finding as the Second Circuit did: "a consumer's clicking on a . . . button does not communicate assent to contractual terms if the offer did not make clear to the consumer that clicking on the . . . button would signify assent to those terms."  *Specht,* 306 F.3d at 29–30.

In any event, there is no factual record here for this Court to determine whether a contract was actually formed.  In *Sprecht*, on the other hand, "the parties placed before the district court an ample record consisting of affidavits and extensive deposition testimony by each named plaintiff" as to whether each plaintiff saw or had the opportunity to see the terms and conditions.  *Id.*, at 28.

**G.**   **Plaintiffs adequately plead a claim for rescission.**

Defendants argue that rescission is not a cause of action, merely a defense, and that Plaintiffs have failed to meet Rule 9(b) pleading standards. Both assertions are incorrect.  First, Connecticut courts recognize rescission as a valid cause of action.  *Pulse Med. Instruments, Inc. v. Drug Impairment Detection Servs., LLC,* 3:09CV1920 (MRK), 2010 WL 1931029 (D. Conn. May 13, 2010) (if plaintiff's fraudulent inducement claims are taken as true, plaintiff "would be entitled to void (or 'rescind') the contract.").  Second, as discussed in Section F, *supra*, Plaintiffs have also pleaded that they would not have entered the Higher One contract if they had known the true facts.  CAC, ¶¶ 216-218.  Their allegation of a procedurally unconscionable contract formation process means that there was no "meeting of the minds" necessary to form a valid contract.  *Id*.  In these circumstances, their rescission claim must be allowed to proceed.  *See Vivid Investments, Inc. v. Best W. Inn—Forsyth, Ltd.*, 991 F.2d 690, 692 (11th Cir. 1993) ("rescission is a remedy that may be sought by the plaintiff").

Here, because Plaintiffs have pleaded mistake, there is at very least a question of fact as to whether the Defendants misrepresentations were "material" and whether Plaintiffs' reliance upon said misrepresentations was "justifiable." *See State v. Hartford Acc. & Indem. Co.*, 136 Conn. 157, 169, 70 A.2d 109, 113 (1949) (citing *E. & F. Construction Co., v. Town of Stamford*, 114 Conn. 250, 257, 158 A. 551) (materiality in a rescission case a question for the fact finder). Plaintiffs' rescission claim should not be dismissed.

H.      Defendants breached the contract.

As discussed above, the Fee Schedules was not properly provided to students prior to or after account opening.  CAC, ¶ 228; *see also*, Section F, *supra*.  Yet Defendants ask this Court to dismiss Plaintiffs' breach of contract claim based *exclusively* on terms contained in the "submerged" Fee Schedules.  First, as the Second Circuit found in *Sprecht*, a contract term provided in a submerged document is unenforceable.  Second, even if the Fee Schedules term relating to ATM fees was a valid part of the contract, it would not say what Defendants want it to say.

Plaintiffs allege that Defendants breached the contract when they allowed Plaintiffs to be charged two fees for every out-of-network ATM usage.  Defendants argue that the "contract's terms are clear" in authorizing the assessment of two ATM fees for each non-Higher One ATM transaction.  MTD, at 33.  According to Defendants, they "disclos[ed] both their own fee . . . and the fact than an ATM operator may, in addition, charge separate fees[.]"  *Id*.  To the contrary, the T&C and the Fee Schedules each indicate that only *one* fee will be charged, and indicate that fee will be by the owner of the non-Higher One ATM.  Defendants also argue that Plaintiffs are essentially complaining about the fees they had to pay to third-parties.  That is false.  Plaintiffs are complaining that the T&C and Fee Schedules repeatedly indicate that third parties will charge them a fee ($2.50) for using a non-Higher One ATM, but never indicate that Higher One will charge its own fee.

The T&C states: "When you use an ATM not owned by us, you may be

charged a fee by the ATM operator or any network used (and you may be charged a fee for a balance inquiry even if you do not complete a fund transfer)." CAC, at Exh. 2. Nowhere in the T&C is there any suggestion that Higher One will charge its own fee for the use of a non-Higher One ATM. In a separate document never affirmatively provided to students, entitled "Fee Schedules," there is a row entitled, "Non-Higher One ATM Transactions (Includes all withdrawals, Inquiries, and declines)." CAC, at Exh. 3. Nowhere on the Fee Schedules does Higher One make it clear that this is a fee being charged by Higher One. Indeed, read together with the T&C, it appears that this is simply a notation of the amount of the fee charged by the non-Higher One ATM bank, which is the only fee referenced in the T&C.

If Higher One wanted to require its customers to pay two fees for each use of a non-Higher One ATM machine, it was required to explicitly include that in the T&C and the Fee Schedules. Instead, in both places, Higher One states that the consumer will have to pay one fee for such a transaction. And the provision that Higher One uses to explain this fee (in the Fee Schedules) does not anywhere state that this is a fee *charged by Higher One*.

The idea that Plaintiffs would have to compare and contrast two different documents—both of which were submerged from their view—to divine the contractual meaning supposedly intended by Higher One (that they could be charged two ATM fees for every withdrawal) is unsupportable. It is an invitation to obfuscation for every drafter of every adhesion contract. At the very least, these two separate statements are ambiguous or conflicting, and the most

**40**

reasonable interpretation is the two documents are describing the same (single) fee.  That this is the most reasonable construction of the contract is supported by the fact that Higher One never stated anywhere the possibility of Plaintiffs or students being charged two fees for the same transaction.

In a contract of adhesion such as Defendants' T&C and Fee Schedules, any ambiguities or contradictions are strictly construed against the drafter.  "Where the language is ambiguous . . . we must construe those ambiguities against the drafter."  *Ramirez v. Health Net of Ne., Inc.,* 285 Conn. 1, 13-14, 938 A.2d 576, 586 (2008) (citing *Cantonbury Heights Condominium Assn., Inc. v. Local Land Development, LLC,* 273 Conn. 724, 735, 873 A.2d 898 (2005)).  "A contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself."  *Oscai v. Exit 88 Hotel LLC,* 127 Conn.App. 731, 736 (2011) (citation omitted).  "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous."  *Id.* at 736–37 (citation omitted).  "When the language of a contract is ambiguous. . . the determination of the parties' intent is a question of fact."  *Connecticut Nat'l Bank v. Rehab Associates,* 300 Conn. 314, 319 (2011) (citation omitted).  Higher One's argument at most creates a question of fact.

I.    <u>Plaintiffs' allegations support a claim for breach of the covenant of good faith and fair dealing.</u>

Defendants argue that Plaintiffs' claim for breach of the covenant of good faith and fair dealing should be dismissed because the contract supposedly "expressly" permitted Higher One to charge the insufficient-funds fees for the overdrawing of an account.  But the contract did not "expressly permit" charging

overdraft fees; it granted Higher One the *discretion* to charge them, and Plaintiffs allege that discretion was not used in good faith.  In light of a federal regulation prohibiting students' accounts from becoming "credit access devices," no reasonable student could suppose that his or her protected financial aid funds would be taken by Higher One merely for making or attempting to make a purchase on insufficient funds.

The covenant of good faith and fair dealing presupposes that the terms and purpose of a contract are agreed upon by the parties, and that what is in dispute is a party's discretionary application of a contract term.  *Renaissance Management Co., Inc. v. Connecticut Housing Fin. Auth.*, 915 A.2d 290, 298 (Conn. 2007).  The covenant requires that neither party do anything to injure the others right to receive the benefits of the contract.  *Landry v. Spitz*, 925 A.2d 334, 344 (Conn. App. 2007).  When one party is given discretion to act under a contract, that discretion must be exercised in good faith.  *See In re Checking Account Overdraft Litigation*, 694 F. Supp. 2d 1302, 1314-1315 (S.D. Fla. 2010).  When the party fails to exercise that discretion reasonably and with proper motive, the covenant of good faith and fair dealing is breached.  *See Hughes v. TD Bank, N.A.*, 856 F. Supp. 2d 673, 681 (D.N.J. 2012).

Here, the Higher One T&C states that if the account holder fails to maintain sufficient funds on deposit to cover all items presented for payment, "[the Defendants] reserve the right, without prior notice to you, *to either pay or return* any item presented for payment against insufficient or uncollected funds."  CAC, at Exh. B at 8; Motion, at Exh. 3 at 8 (emphasis added).  The T&C also provides

**42**

that Higher One "*may* charge [the] Account a fee for the payment, or return of the item against insufficient or uncollected funds" (emphasis added).  *Id.*  Plaintiffs do not seek to vary these contractual terms, but only demand that the discretion granted by those contractual terms be used in good faith.  While the Higher One T&C said it would "pay or return" insufficient funds transactions and "may" charge a fee for doing so, in reality it charged a $29 fee every time, and charged a fee for doing so every time.

Contrary to Defendants' argument that Plaintiffs failed to allege bad faith, the CAC alleges that Higher One abused its discretion and acted in bad faith by systematically approving overdraft transactions, CAC, ¶¶ 236-237, even though those financial aid funds had a "protected" status under federal law.  No student would suppose Higher One would use its discretion to charge a $29 fee each time a student so much as attempted a transaction on insufficient funds.

J.    <u>Plaintiffs have adequately pleaded a claim for conversion.</u>

Defendants argue that Plaintiffs' conversion claim must be dismissed because Plaintiffs cannot "allege that Defendants deprived them of access to the funds in their accounts."  MTD, at 44.  That is incorrect.  Plaintiffs allege Defendants permanently deprived them of certain funds in their account, in the form of improperly charged bank fees.  There can be no doubt that Plaintiffs, at all times, maintained a right to *possession*, if not ownership, of the funds in their checking accounts; at all times depositors have instantaneous access to these funds at ATMs and in POS transactions as well as online.  Thus, even if *title* to the funds passes to the bank when the funds are deposited, Plaintiffs have a right to

possess those funds at any time.  *See Bank Brussels Lambert v. Credit Lyonnais,* No. 93 Civ. 6876 LMM, 2000 WL 174955, at *6 (S.D.N.Y. Feb. 15, 2000) ("[P]laintiffs, to sustain a conversion claim, need not establish legal ownership of the funds in question: it is sufficient if they establish an immediate right of possession.").  In short, neither legal title nor absolute ownership of the property is necessary in order to properly assert a claim for conversion.

Here, Plaintiffs have alleged that Defendants wrongfully took funds in the form of bank fees from their accounts so that they were unable to possess and use the funds.  Several courts have recently upheld conversion claims in exactly these circumstances.  *In re Checking Account Overdraft Litigation*, 694 F.Supp.2d at 1322-1323 ("interference with Plaintiffs' property interest in the funds in their accounts constitutes a cause of action for conversion."); *Hawthorne  v. Umpqua,* C-11-6700 YGR, 2012 WL 1458194, at *2 (N.D. Cal. Apr. 26, 2012) ("Here, Plaintiffs allege that [the bank] has collected for itself specific and readily identifiable funds from their accounts to pay for wrongfully collected overdraft fees and that it continues to retain these funds without their consent. There is no indication that the bank intends to return those funds.  These allegations are sufficient to state a claim for conversion"); *see also Hughes v. TD Bank, N.A,* 856 F. Supp. 2d 673, 680 (D.N.J. 2012); *Cruthis v. Firstar Bank, N.A.*, 822 N.E.2d 454, 463-64 (Ill. App. Ct. 2004) (affirming a jury finding of a bank's conversion in the form of its wrongful withdrawals of money from the plaintiff's general checking account); *Katz v. Belmont Nat'l Bank of Chicago*, 491 N.E.2d 1157, 1159 (Ill. 1986) (bank could be held liable for conversion because the depositor has the "absolute and

44

unconditional" right to "the immediate possession" of the funds on deposit in his account.).

Defendants' reliance on this Court's decision in *Davis*, 2013 WL 1296473, is unavailing.  In that case, the Court found that "the Bank did not take the funds belonging to one customer and give those funds to another to customer or apply them to the payment of custodial fees to the exclusion of the first customer's rights to those funds."  Here, as discussed immediately above, Plaintiffs have in fact alleged that Defendants have permanently deprived them of access to the funds Higher One took in the form of bank fees.  Defendants have therefore provided no basis for the dismissal of the conversion claim.

K.      **Plaintiffs adequately allege a claim for statutory theft.**

Defendants argue that Plaintiffs' Statutory Theft (Conn. Gen. Stat. 52-564) cause of action fails because Plaintiffs "do not allege that Higher One had a specific intent to steal Plaintiffs' money."   But the CAC alleges that Defendants designed a set of policies and procedures to herd students into their Higher One accounts and charge unconscionable and deceptive fees, and specifically alleges that they did so "intentionally."  CAC, ¶¶ 52, 74, 98.  Those allegations must be taken as true.  "[I]f facts provable in the complaint would support a cause of action, the motion to strike must be denied . . . Thus, we assume the truth of both the specific factual allegations and any facts fairly provable thereunder. In doing so, moreover, we read the allegations broadly ... rather than narrowly."  *Batte–Holmgren v. Commissioner of Public Health,* 281 Conn. 277, 294 (2007) (internal quotation marks omitted).  To the extent the Court believes that further proof of

**45**

intent is necessary, Plaintiffs must be provided the opportunity to develop the record in discovery.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss in its entirety.  If this Court determines that any claim, or part of any claim, is inadequately pleaded, Plaintiffs should be granted leave to re-plead.  The Second Circuit "strongly favors liberal grant of an opportunity to replead after dismissal of a complaint under Rule 12(b)(6).  *Porat v. Lincoln Towers Cmty. Ass'n*, 464 F.3d 274, 276 (2d Cir. 2006).

Dated:  May 13, 2013                    Respectfully submitted,

/s/ Hassan A. Zavareei              SHEPHERD FINKELMAN MILLER & SHAH LLP
Hassan A. Zavareei                  James E. Miller (ct21560)
TYCKO & ZAVAREEI LLP                Karen M. Leser-Grenon (ct23587)
Hassan A. Zavareei (*pro hac vice*)   65 Main Street
Jeffrey D. Kaliel (*pro hac vice*)    Chester, CT 06412
2000 L Street NW, Suite 808         Telephone: (860) 526-1100
Washington, DC 20036                Facsimile: (860) 526-1120
Telephone: (202) 973-0900           jmiller@sfmslaw.com
Facsimile: (202) 973-0950           klesser@sfmslaw.com
hzavareei@tzlegal.com
jkaliel@tzlegal.com                 GENTLE TURNER SEXTON DEBROSSE &
                                    HARBISON
*Interim Lead Counsel*                Diandra Debrosse
                                    501 Riverchase Parkway East
                                    Suite 100
                                    Hoover, AL 35244
                                    Telephone: (205) 716-3000
                                    Facsimile: (205) 716-3010
                                    ddebrosse@gtandslaw.com

                                    JONES WARD PLC
                                    Jasper Ward
                                    Alex Davis
                                    312 S Fourth Street, 6th Floor
                                    Louisville, KY 40202
                                    Telephone (502) 882-6000
                                    Facsimile: (502) 587-2007
                                    jasper@jonesward.com
                                    alex@jonesward.com

                                    *Plaintiffs' Steering Committee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 13, 2013 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.


   /s/ Hassan A. Zavareei
   Hassan A. Zavareei